UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOROTHEA RENNER,

              Plaintiff,

-against-

LPI A-S USA, LLC d/b/a THE LEADERSHIP PIPELINE INSTITUTE,

              Defendant.

Case No.: 25-cv-03317

**COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Dorothea Renner, by her attorneys, Crumiller P.C., as and for her complaint against LPI A-S USA, LLC d/b/a The Leadership Pipeline Institute ("LPI") alleges as follows:

## PRELIMINARY STATEMENT

1. Renner is a 42-year-old woman who was employed as a Vice President and Partner at LPI from October 2023 until her wrongful termination on April 23, 2024.

2. LPI hired Renner as a VP and Partner (North America) with a focus on improving DEI initiatives, marketing and program design both internally and for LPI's clients. While working toward this goal, Renner reported directly to CEO Kent Jonasen.

3. Jonasen co-authored a 2024 spin-off of LPI's founding text alongside Ram Charan, Stephen Drotter, and James Noel entitled, *The Leadership Pipeline: Developing Leaders in the Digital Age*.[1] Notably, Ram Charan is a world-renowned global business advisor, consultant, author, and speaker, even serving on the esteemed Blue Ribbon Commission on Corporate Governance. Throughout his storied tenure, Charan has gained over 35 years of experience in training CEOs, working with the likes of Toyota, Bank of America, Uniqlo, and countless other

---

[1] LPI's founding text, *The Leadership Pipeline: How to Build the Leadership Powered Company*, was originally published in 2001 and authored without Jonasen by Ram Charan, Stephen Drotter, and James Noel.

1

high-profile companies. Fortune Magazine has called Charan "the most influential consultant alive," a "guru" and "corporate sage."[2]

4. Despite LPI's global recognition, it quickly became apparent to Renner that the company's internal standards did not live up to its reputation. Indeed, throughout her tenure, LPI subjected her to a sexually-charged and sexist hostile work environment. Renner was also privy to regular, unsolicited political and religious commentary from her coworkers.

5. The main offender was Master Facilitator Keith Catchpole. Catchpole repeatedly disparaged Renner's DEI efforts (even though DEI work was her main responsibility), called Renner a "Marxist," proclaimed that gender-neutral language was part of an "anti-Christian" agenda, and repeatedly stated that "God created two sexes."

6. When Renner attempted to report Catchpole's behavior to Jonasen, he repeatedly asked whether she had "provoked" him, implying that Renner bore responsibility for his remarks. Jonasen also failed to discipline Catchpole, and joked that Renner was a "communist" and should attend Catchpole's church.

7. Even worse, during a January 2024 meeting, Jonasen commented on Renner's weight gain, remarking that Renner had been a "real babe before" and that her husband was a "good man" for marrying her still. Jonasen continued making sexist comments in the following months.

8. On another occasion, when Renner said she thought Catchpole held racist beliefs, Jonasen became angry, yelling, "no one cares about diversity," and that "Catchpole was right" about Renner.

9. On April 23, 2024, Jonasen called Renner to inform her that she was being fired, not as a matter of performance, but as "punishment" for calling Catchpole's views racist.

---

[2] David Whitford, *The Strange Existence of Ram Charan*, FORTUNE MAG. (April 27, 2007), https://money.cnn.com/magazines/fortune/fortune_archive/2007/04/30/8405482/index.htm.

2

**PARTIES**

10. Dorothea Renner is a 42-year-old woman who lives in Denver, Colorado. She was employed by LPI as a Vice President and Partner from October 2023 through her termination on April 23, 2024.

11. LPI is a multinational business leadership consulting corporation with dual headquarters in New York, NY and Copenhagen, Denmark. The company provides leadership development programs and consulting services to various companies. Its principal place of business in the United States is located at 48 Wall St, Ste 1100, New York, NY. LPI has over 15 employees.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over Renner's claims pursuant to 28 U.S.C. § 1331 and 1343, as she has asserted claims that arise under the federal laws of the United States. This Court additionally has diversity jurisdiction over Renner's claims pursuant to 28 U.S.C. § 1332, as Renner resides in Colorado and Defendant LPI is headquartered in New York. This Court also has supplemental jurisdiction over Renner's state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims in this action such that they form part of the same case or controversy.

13. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) as LPI's United States Headquarters is located within this district.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

14. On September 26, 2024, Renner filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging claims under Title VII of the Civil Rights Act of 1964, 42. U.S.C. § 2000e *et seq.* ("Title VII").

15. On April 2, 2025, the EEOC issued Renner a Notice of Right to Sue. She timely files this lawsuit against LPI within 90 days thereafter.

## FACTUAL ALLEGATIONS

*Renner Begins Working at LPI*

16. Renner began working for LPI as Vice President and Partner of LPI's North American Regional Offices. In this role, Renner reported directly to CEO Kent Jonasen.

17. LPI hired Renner to expand the company's diversity, equity, and inclusion ("DEI") programs internally and for LPI clients. Renner also designed and delivered leadership development services to various clients.

18. LPI's corporate structure is reflected in the chart below.



*Renner Is Subjected to an Uncomfortable "Boy's Club" Working Environment*

19.     In late October and early November, in multiple video meetings, Master Facilitator Keith Catchpole gave unsolicited opinions about his political views, religion, "bourbon drinking," and referred to himself as a "Kentucky boy."

20.     Though she was put off by these comments, Renner refrained from mentioning Catchpole's remarks to his supervisors, COO Anders Ibsen and CEO Kent Jonasen.

21.     Renner did, however, ask her fellow VP and Partner, David Loiselle, if Catchpole made these kinds of comments regularly and, if so, how he navigated his interactions with Catchpole.

22.     Loiselle explained that Catchpole regularly shared his political, social, and religious views and openly disliked anyone he believed had a "Democratic agenda."

23.     Loiselle also stated that, while he agreed with some of Catchpole's views, he wasn't entirely aligned with them.

24.     Following this conversation, Catchpole continued to make remarks of this nature in meetings.

25.     In early November, during a meeting with Renner, Catchpole made a disparaging comment about immigration, despite knowing that Renner's husband was an immigrant.

26.     Renner reminded Catchpole that her husband had recently received his green card and had emigrated to the United States to pursue an advanced degree.

27.     Catchpole simply replied, "Well, he is an exception."

28.     On November 14, Renner and Catchpole met to review "first-line leader training," but instead of a review, Catchpole began to express his views and told Renner that he had "problems" with the *For Your Discovery* program that Jonasen had asked her to build.[3]

---

[3] This was a leadership program for first-generation college students.

29. For example, he told Renner that he was enraged by her use of gender-neutral language in a survey for LPI clients, including Zillow, LPI's largest U.S. client.

30. Renner knew Zillow had removed gender-specific language from company materials and implemented changes to be more inclusive, including providing options for gender-neutral restrooms, and she wanted to respect the client's decision.

31. Catchpole was angered by Renner's suggestion that clients like Zillow use gender-neutral language (e.g., changing "please rate his/her manager" to "please rate their manager") as he began berating her.

32. He called Renner a Marxist, told her that "people like [her]" would lead her country to "communism," and referred to her as "anti-Christian."

33. Catchpole then launched into a tirade against the transgender community, exclaiming, "God created two sexes and anyone who believes differently or supports LGBTQs is an anti-Christian!"

34. He further declared that there was no need for DEI efforts in the workplace, or anywhere for that matter, and that "white men and Christians are the ones truly being discriminated against."

35. He added that he did not "believe" in DEI efforts and that the Black Lives Matter movement was to blame for this "DEI crap."

36. Catchpole followed this comment up by asserting that Renner "should know that one of [his] best friends is Black." Renner was taken aback, as these were programs and changes that LPI had specifically asked her to create.

37. At no point prior to or during this conversation had Renner ever spoken with Keith about her political views, nor had she ever mentioned communism, Black Lives Matter, or the LGBTQ community whatsoever.

38. Catchpole then warned her "she should be aware and beware" that Jonasen and Ibsen were not supportive of the "woke stuff/agenda," and Renner should take that into consideration. He added that he, Jonasen, Ibsen and Drotter had discussed this at a conference in Napa prior to Renner joining the company.

39. He concluded by forbidding Renner from sharing the DEI program with any of his clients and claiming the program was exclusionary to white men.

40. Renner attempted to explain that the program was designed to help individuals without professional mentors and those early in their careers explore potential career paths in leadership and specialist tracks that they may have previously not considered.

41. She further explained that white people were not excluded from this demographic because the program could be used for all first-generation college students. Renner then immediately asked to end the video conference, as she realized Catchpole wanted to rant and yell rather than have a constructive conversation.

42. That same day, Loiselle informed Renner that Catchpole had called him to rant about Renner, the career discovery program, and her recommendation regarding the gender-neutral survey language.

43. He also said that Catchpole had shared with him the substance of their November 14 meeting.

44. Renner told Loiselle that Catchpole's behavior was unprofessional and made her uncomfortable and that she would be reporting his conduct to Jonasen.

***Renner Engages in Protected Activity Six Weeks into Her Employment at LPI***

45. That evening, Renner formally reported Catchpole's offensive behavior to Jonasen via email writing that "the topics discussed were inappropriate for the workplace" and that "if Keith [Catchpole] were at a large corporate organization here in the US . . . the topics would be escalated to HR and likely could be grounds for termination."

46. She went on to state that "the conversation took a crazy turn and escalated to him telling [her] that '[her] ideas' are generated from Marxism, and by introducing anything related to 'promoting diversity' [she is] promoting Marxism, and that [her] ideas/views are somehow in conflict with Christianity."

47. She wrote that Catchpole told her "he doesn't agree with 'the stuff [she] promote[s]' about there being more than two sexes" and that "two sexes were a fact of the bible."

48. She wrote that she "informed [Catchpole] that [she] know[s] diversity is important to every company [she] worked for . . . that it will likely be important to the clients [she] solicited, and that personally 'diversity' is part of [her] life every day – as [she is] married to someone from a different ethnicity and culture."

49. She advised Jonasen that Catchpole "may need a reminder that applicants, employees, and former employees are protected from employment discrimination based on race, color, religion, or sex."

50. The next day, November 15, 2023, Ibsen reached out to Renner to request more details about the incident with Catchpole asking her if she had "done anything" to provoke the name-calling. Implying that Renner had caused Catchpole's tirade against diversity.

51. She replied that the program itself and her gender neutral language seemed to trigger Catchpole.

52.  Ibsen responded that he was not surprised that Catchpole had spoken to her that way given how he regularly expressed his "extreme" views.

53. Ibsen noted that Catchpole had made similar comments in a client meeting, and it had caused some concern for LPI.

54. Later that day, Jonasen reached out to Renner requesting additional details about Catchpole's comments.

55. Renner repeated Catchpole's voiced opinions about communism and his earlier offensive comments, and Kent confirmed he had had issues in the past with Catchpole overstepping boundaries and being aggressive about his political and religious views widely known.

56. Jonasen also explained that "with the exception of the LGBTQ stuff, "he supportive of diversity.

57. At this point, Renner expressed that she no longer felt comfortable working or traveling to client sites with Catchpole alone but would continue working with him in group settings as needed.

58. Jonasen assured Renner that he understood her concerns and that Catchpole would be disciplined.

59. Catchpole was never formally disciplined following this complaint, and he was merely directed to record his training sessions for some time.

60. Later that week, Jonasen called Renner to inform her of his conversation with Catchpole regarding her complaints. He explained that Catchpole had confirmed some of what Renner reported and reiterated his issues with communism.

61. Jonasen then asked Renner if she had told Catchpole that she "hate[d] all white men," as Catchpole reported that this was what caused him to "go off."

62. Renner was taken aback by this accusation – she had never said anything remotely resembling this sentiment to Catchpole, and it was additionally preposterous that she would given that she herself is white.

63. Renner explained this to Jonasen and added that she didn't "hate" any one group of people.

64. Jonasen, seemingly incredulous, asked Renner again whether she had made this assertion about "white men." Accusing her for a third time that she somehow caused Catchpole's wildly inappropriate behavior.

65. After Renner insisted again that she had not, Jonasen finally dropped the matter, mumbling that he must have "misunderstood."

***Renner Is Openly Mocked for Her Choice to Engage in Protected Activity***

66. Less than a month later, on December 4, Renner traveled to Copenhagen for business meetings with Jonasen and Ibsen.

67. On the first day of the trip, Ibsen offered to walk with Renner to find gluten-free food, as she had Celiac disease.

68. During the walk, Ibsen informed Renner that, following her complaint, Catchpole would be required to record his sessions with new facilitators.[4]

69. Ibsen, for the fourth time, asked whether Renner had "provoked" Catchpole; she reiterated that she hadn't done or said anything specifically, but that diversity work she was asked to create seemed to trigger Catchpole.

70. On December 6, Jonasen hosted a dinner at his home in Copenhagen for LPI's VPs and partners globally.

---

[4] Facilitators were contractors that facilitate most of the LPI courses for companies.

10

71.     At dinner, Jonasen joked about Renner being a Marxist and communist and said, "Maybe [she] could go to [Catchpole's] church."

72.     Renner found it inappropriate that the company CEO openly referred to a formal complaint in a jovial manner. However, she tried to play along because she was still new to the group and wanted to be perceived as an easygoing team member.

73.     On December 8, during a team Christmas dinner at a restaurant, Jonasen again made jokes referencing the incident with Catchpole, particularly about Renner being a communist and hating white men.

74.     There were at least 15 people present at the dinner when Jonasen made these comments, including LPI's VPs and partners, alongside one of LPI's vendors. Stephanie Lynge, who was sitting nearby, asked Jonasen what he was referring to making Renner, again, uncomfortable.[5]

75.     During this same dinner, Renner noticed two of the married male partners, both in their forties – Anders Rona Duer and Loiselle – flirting with twenty-something year-old women at another table of the restaurant.

76.     Eventually, Loiselle left the table, but Duer stayed and began touching one of the women's hair and arms. Lynge asked Jonasen and Ibsen if they planned to intervene. Jonasen seemed to find the situation funny and declined to get involved, but he and Ibsen both agreed that Duer's wife would "kill him," remarking that she was "Middle Eastern so she'[d] *really* kill him," as though that was somehow relevant.

---

[5] Stephanie Lynge, Director of Client Success, overheard Jonasen and joined the conversation. Ibsen then approached Renner and told her not to discuss the incident with Lynge. Renner informed him that it had been Jonasen who brought it up, just as he had done at the dinner two days prior. Ibsen then turned to Jonasen and told him to stop discussing Catchpole's outburst as he wanted Catchpole to be "successful." At no point did Ibsen express any desire for Renner to be "successful."

11

77. On January 10, Renner returned to Copenhagen. During a meeting between Renner and Jonasen, Kent remarked that Renner didn't "look well."

78. Renner disclosed that she suffered from an autoimmune disease and that she struggled with side effects of the medication she had to take. She explained that these side effects included fatigue, reduced immunity, and weight gain.

79. Jonasen replied that he had seen old photos of Renner online and that she used to be a "real babe" before she gained weight.

80. Renner, trying to remain professional, simply said, "Yes, I have gained forty pounds, and it's been hard for me."

81. Jonasen then asked if she had gained the weight before or after getting married, to which she replied, "half-and-half."

82. Jonasen responded, laughing, that her husband was a "good man" for still marrying Renner, and added, "on the bright side, at least you're now more relatable to the HR ladies that are our clients or potential clients. In fact, you could gain a little more weight to be closer to them." Jonasen then remarked that his girlfriend thought Renner "still had a beautiful face."

83. Later that day, Jonasen joked that he could "get money" for having an employee with a disability and would continually make this "joke" about Renner during her time at LPI.

84. Shortly thereafter, Ibsen walked into the room, and Renner repeated to him what Jonasen had just said to her. Ibsen turned to Jonasen and said, "Kent [Jonasen]! Be careful what you say to those Americans," referring to Renner, "because of their frivolous lawsuits."

85. Renner was hurt and rendered speechless by the entire exchange.

86. During this same trip, on January 11, outside of a team session with facilitators, Jonasen oddly pointed out a colleague by saying, "Dorothea, that is Flemming. His wife is younger than

you." Renner looked at Flemming who was bizarrely doing lunges and kicks behind a meeting room table.

87.     Jonasen proceeded to "joke" in front of Renner and Flemming about the significant age difference between Flemming and his wife.

88.     Jonasen then remarked that Flemming needed to "stay limber" for his young wife, apparently explaining the reason for Flemming's exercises at the workshop table.

89.     The entire exchange reeked of sexism and made Renner extremely uncomfortable.

***Renner Continues to be Subjected to LPI Executives' Bigotry***

90.     In the months that followed, Jonasen continued to make inappropriate, sexist, and/or racist comments, including, but not limited to:

- Suggesting that men with a lot of money had many options for women, and if a woman did not respond to a first online interaction, he would just date other women and then come back to the first;[6]
- Remarking that he understood people in the US being anti-immigration because it was "so easy" and that he "couldn't believe" one could have citizenship just by being born on American soil;
- Repeating a Board Member's (Ram Charan) statement that the Board of Directors is rendered ineffective due to DEI efforts to have diversity on their boards, especially "certain types of diversity;"
- Expressing concern about Black prospective candidates, including two highly accomplished candidates Renner recommended, by saying that he had hired a Black woman "who was *even* pretty and professional" before and none of the clients wanted to work with her, so he let her go;
- As to another prospective female candidate, Jonasen claimed that she was "too old" and stated that he wanted younger candidates;
- Accusing Renner of marrying her husband "for his looks" and suggesting that he received his education from a "third world" country (i.e., Brazil);
- On multiple occasions, ranting about unions and workers' rights and stating, "Good luck to anyone who ever tried to sue [him] because he had intentionally structured his company to be 'immune.'"

---

[6] This took place during a work trip in Orlando, FL.

91.     On April 14, ahead of a conference in Las Vegas to promote LPI, Renner had dinner with Jonasen and Loiselle.

92.     Renner had made the reservation ahead of time but realized that the dinner and show she had booked included topless performers, so she changed the reservation last-minute to a steakhouse.

93.     When Renner explained the change in venue, Jonasen said that they should have gone to the initial restaurant with the topless performers and that there was "nothing wrong with that."[7]

94.     Renner responded that going to the venue would not be appropriate for a work event, and that she would feel uncomfortable. Kent then mocked her for this response.

95.     The next day, Renner, Jonasen, and Loiselle attended the conference. That evening, the team had dinner at a local restaurant – Wakuda. At the dinner, Loiselle and Kent again started to pepper Renner with questions about why she felt uncomfortable with Catchpole.

96.     Jonasen told Renner that he had conducted a survey of Catchpole's colleagues, and Renner and one other person were the only two to give negative feedback about him.

97.     He then asked Renner, "What does that say about you?" Renner was taken aback and asked Jonasen if he was implying that she had been lying about Catchpole's conduct.

98.     Jonasen tersely replied, "Data doesn't lie." Renner replied that the data measured his skills as a facilitator, not his interpersonal conduct.

99.     Jonasen, seemingly ignoring Renner, explained that Catchpole was not a Republican but, instead, a "true Libertarian;" Loiselle agreed. Renner, growing emotional from Jonasen and Loiselle's relentless berating, started to tear up.

---

[7] Renner responded that that would not be appropriate for a work event, and she would feel uncomfortable. Kent then mocked her.

14

100.    Eventually, she gathered herself and reiterated that she didn't appreciate the two of them mocking her experience. She explained that she didn't feel comfortable working with Catchpole alone because of his temper, and she thought many of his beliefs were racist.

101.    At this point, Jonasen became angry and said, "No one cares about diversity or democratizing leadership development – just the bottom line" and that he now believed Catchpole was right about Renner.

102.    Renner asked Jonasen to "please stop" as it was not appropriate to discuss Catchpole in front of Loiselle and others. Kent continued his rant until Renner was no longer able to keep herself from crying and had to excuse herself from the table.

103.    On April 23, after Renner had returned to Colorado, Jonasen called Renner and told her he was firing her because she had said she did not feel comfortable with Catchpole and his racist views.

104.    Jonasen told Renner that she was not being fired due to any performance issues but because she had used the term "racist."

105.    He said that Catchpole was now threatening to sue LPI for defamation if he did not terminate Renner's employment.

106.    He also elaborated that he did not like how Renner spoke about Trump. Renner reminded Jonasen that it was Loiselle who brought up Catchpole and Jonasen himself who brought up Trump; he replied that he "did not remember who brought up what" but that what Renner said was wrong regardless.

107.    Renner asked how Catchpole knew about the conversation, given that he had not been present, but Jonasen did not respond.

108. Jonasen reiterated that Renner was "smarter than most of the team" and had "lots of potential," but that he needed to fire her as "punishment," and she needed to "learn to be quiet."

109. Jonasen then asked Renner if she wanted to work out a deal where he would terminate her W-2 employment and existing fixed-fee contract but then sign a new commission contract where she would sell Jonasen's products through her own business.

110. Renner asked Jonasen why he would want to work with her if he thought she should be fired. He replied that while she had demonstrated the necessary skills to be successful, he had "no choice" but to "do something" to punish her.

111. Renner told Jonasen that she was not interested in selling his products and that terminating her for this reason was "unfair and unlawful."

112. On September 26, 2024, Renner filed a charge of gender-based discrimination and retaliation with the EEOC.

*LPI's Actions have Wreaked Havoc in Renner's Life and Health*

113. After LPI terminated her employment, Renner searched diligently for a new, comparable position for approximately one full year.

114. To add insult to injury, Jonasen demanded Renner publicly end her LPI employment on her LinkedIn page, showing potential employers a significant gap in Renner's employment. This continued to make it difficult for Renner to obtain a new, comparable role.

115. Renner finally received an offer for a comparable position in March 2025, but was forced to relocate from Colorado to California just one year after purchasing a house with her husband in Colorado.

116.    In addition to these economic damages, LPI's discrimination and retaliation has had a lasting impact on Renner's emotional and physical well-being: over the last year, Renner has struggled with anxiety, sleeplessness, nightmares and heart palpitations.

117.    Additionally, Renner lives with significant physical disabilities — including severe autoimmune and cardiac diseases — that became increasingly difficult to manage following LPI's termination of her employment. The stress has directly exacerbated Renner's autoimmune disorder, resulting in a weakened immune system, the dysregulation of her immune cells, and increased inflammation. As a result, Renner had to undergo treatments she never needed prior to this incident: she had weekly intravenous infusions — an extremely costly antibody treatment where each batch is made using the pooled plasma of at least 1,000 donors — biweekly osteopath treatment, and more frequent appointments with specialists. She also had to increase the dosage of two of her six prescription medications.

118.    Notably, to continue the intravenous infusions from her new home in California, Renner must fly back regularly to Colorado, due to a shortage of available specialists in her area.

*Post-Termination Retaliation*

119.    On March 17, 2025, Defendant, through counsel, sent a letter to Renner threatening litigation in Denmark unless Renner withdrew her EEOC charge of discrimination against LPI and Jonasen.

120.     Defendant explicitly demanded that Renner withdraw her discrimination accusations or provide "sufficient evidence" to substantiate her claims. If not, Defendant threatened to pursue a defamation case against Renner before the Danish courts, requesting compensation and damages "as a consequence of [her] defaming actions."

121. This intimidation tactic, especially if implemented, only serves to retaliate against Renner for pursuing her legal and civil rights against discrimination and retaliation in the workplace.

## FIRST CAUSE OF ACTION:
### Discrimination in Violation of Title VII

122. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

123. Defendant unlawfully discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender by, *inter alia*, subjecting her to a hostile work environment and/or disparate working conditions in violation of Title VII.

124. As a result, Plaintiff has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

125. Defendant willfully engaged in discriminatory practices with malice and/or reckless indifference to Plaintiff's federally protected rights.

126. Therefore, Plaintiff is entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees, costs and disbursements.

## SECOND CAUSE OF ACTION:
### Retaliation in Violation of Title VII

127. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

128. Defendant unlawfully retaliated against Plaintiff by, *inter alia,* terminating her employment for her protected discrimination complaints in violation of Title VII.

129. As a result, Plaintiff has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

130. Defendant willfully engaged in retaliatory practices with malice and/or reckless indifference to Plaintiff's federally protected rights.

131. Therefore, Plaintiff is entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees, costs and disbursements.

### THIRD CAUSE OF ACTION:
### Discrimination in Violation of the Colorado Anti-Discrimination Act ("CADA")
### C.R.S. §§ 24-34-401 *et seq*.

132. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

133. Defendant unlawfully discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender by, *inter alia*, subjecting her to a hostile work environment and/or disparate working conditions in violation of CADA.

134. As a result, Plaintiff has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

135. Defendant willfully engaged in discriminatory practices with malice and/or reckless indifference to Plaintiff's state protected rights.

136. Defendant's unlawful actions directly and proximately caused Plaintiff's economic and emotional distress damages.

137. Therefore, Plaintiff is entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees, costs and disbursements.

### FOURTH CAUSE OF ACTION:
### Retaliation in Violation of the Colorado Anti-Discrimination Act ("CADA")
### C.R.S. §§ 24-34-401 *et seq*.

138. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

139. Defendant unlawfully retaliated against Plaintiff by, *inter alia,* terminating her employment for her protected discrimination complaints in violation of CADA.

140. As a result, Plaintiff has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

141. Defendant willfully engaged in retaliatory practices with malice and/or reckless indifference to Plaintiff's state protected rights.

142. Defendant's unlawful actions directly and proximately caused Plaintiff's economic and emotional distress damages.

143. Therefore, Plaintiff is entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees, costs and disbursements.

## DEMAND FOR RELIEF

WHEREFORE, it is respectfully requested that the Court enter judgment, in an amount to be determined by the trier of fact, as follows:

1) on the First, Second, Third, and Fourth Causes of Action, awarding compensatory damages, punitive damages, attorney's fees, interest, and costs; and

2) granting such other relief as may be just.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP § 38(b), Renner demands a trial by jury.

Dated:      Brooklyn, New York
            April 22, 2025

                                            Julia Elmaleh-Sachs
                                            Crumiller P.C.
                                            16 Court St, Ste 2500
                                            Brooklyn, NY 11241
                                            (212) 390-8480
                                            julia@crumiller.com
                                            Attorneys for Plaintiff